RACHEL S. DOUGHTY (SBN 255904)
Greenfire Law
1202 Oregon Street
Berkeley, CA 94702
Telephone: (828) 424.2005
Email: rdoughty@greenfirelaw.com

JAMES M. BIRKELUND (SBN 206328)
Law Offices of James Birkelund
548 Market St., # 11200
San Francisco, CA 94105
Telephone: (415) 602.6223
Fax: (415) 789.4556
Email: james@birkelundlaw.com

GARY DAVIS (SBN 098792) (admission pending)
Davis & Whitlock, P.C.
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone: (828) 622.0044
Fax: (828) 398.0435
Email: gadavis@enviroattorney.com

Attorneys for Plastic Pollution Coalition,
a project of Plaintiff Earth Island Institute

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PLASTIC POLLUTION COALITION, a project of EARTH ISLAND INSTITUTE, a non-profit organization,<br><br>    Plaintiff,<br><br>v.<br><br>AMCOR RIGID PLASTICS USA, INC.,<br><br>    Defendant. | Case No. _____   (___)<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*) |

Plaintiff Plastic Pollution Coalition, a project of Earth Island Institute ("Plastic Pollution Coalition"), alleges as follows:

## NATURE OF THE CASE

1. This is a citizen's suit, brought pursuant to the provisions of Section 505(a)(1) of the federal Clean Water Act (hereinafter "CWA"), as amended, 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Amcor Rigid Plastics USA, Inc. ("Amcor") arising out of Amcor's industrial activities at its facility located at 2425 South Watney Way in Fairfield, Solano County, California (the "Facility").

2. Since at least October 1, 2009, Amcor has failed to comply with the requirements of the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, NPDES General Permit No. CAS000001 ("Storm Water Permit") that are designed to prevent discharges of pollutants, including the monitoring, reporting, and revision of storm water management practices as necessary.[1] In addition, Amcor has discharged pollutants into surface waters and the public storm water system that drains to Suisun Slough, Suisun Bay, and San Francisco Bay, in violation of 33 U.S.C. § 1311(a) and the Storm Water Permit.

3. Amcor uses tons of pre-production plastic at the Facility in operations exposed to storm water. Storm water discharges containing preproduction plastic are a significant contributor of pollutants to waters of the state, directly harming wildlife that ingest the plastic

---

[1] The State Board has issued a new General Industrial Permit for Storm Water Discharges: Order No. 2014-0057-DWQ ("2015 Storm Water Permit"). Relevant to plaintiff's claims, the 2015 Storm Water Permit is as or more stringent than the existing Storm Water Permit. For example, the 2015 Storm Water Permit will require monthly observation of storm water drainage areas throughout the year, will double the number of sampling requirements, continues to require preparation of a Storm Water Pollution Prevention Plan ("SWPPP"), prohibits non-storm water discharges, and explicitly addresses storm water management for pre-production plastic dischargers.

The 2015 Storm Water Permit has been challenged by a number of citizen water quality organizations. *See California Coastkeeper Alliance v. State Water Resources Control Board*, filed May 8, 2014.

COMPLAINT                                                2                                        U.S. DISTRICT COURT

1  and often starve as a result and concentrating other pollutants which ultimately enter the food
2  chain when later ingested.

3      4.    Amcor has demonstrated a consistent disregard for its obligations under the
4  CWA. It has discharged pollution in violation of the CWA and to the detriment of the
5  environment and plaintiff's members who use that environment. Amcor's CWA monitoring and
6  reporting deficiencies have resulted in plaintiff's members being unable to know the full extent
7  of pollution in Suisun Slough, adjacent wetlands, and the San Francisco Bay, inhibiting their
8  use and enjoyment thereof.

9      5.    Plaintiff Plastic Pollution Coalition seeks a declaratory judgment, injunctive
10 relief, the imposition of civil penalties, and the award of costs (including attorney and expert
11 witness fees) for Defendant Amcor's repeated, continuous, and ongoing violations of the CWA.

## JURISDICTION

13     6.    This Court has subject matter jurisdiction over the CWA claims set forth in this
14 Complaint pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

15     7.    Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to
16 Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plastic Pollution Coalition, on
17 October 1, 2014, mailed a notice of intent to file suit under the CWA to address the violations at
18 the Facility to:  Amcor, the U.S. Attorney General, the Administrator of the U.S. Environmental
19 Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Director of
20 the California State Water Resources Control Board ("State Board"), and the Executive Director
21 of the San Francisco Bay Regional Water Quality Control Board ("Regional Board") ("October
22 Notice"). [Attached hereto as Exhibit "A" and incorporated by reference herein.] The October
23 Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More
24 than 60 days have passed since the October Notice was served on Amcor and these agencies.

25     8.    Neither the EPA nor the State Board nor the Regional Board ("Public Enforcers")
26 has commenced, nor is any one of the Public Enforcers diligently prosecuting, a civil or
27 criminal action in a court of the United States to redress the violations of the CWA by Amcor.
28 In addition, none of the Public Enforcers has commenced an administrative penalty action under

Section 309(g) of the CWA, 33 U.S.C. § 1319(g), or under a comparable California law, to redress the violations of the CWA by Amcor.

9. Plastic Pollution Coalition will, immediately upon receipt of a file stamped copy of this Complaint, mail a copy of this Complaint to each of the Public Enforcers and the Attorney General of the United States.

## VENUE AND INTRADISTRICT ASSIGNMENT

10. Venue is appropriate in the Eastern District of California, pursuant to Section 505(c) of the CWA, 33 U.S.C. § 1365(c), because the source of the violations is located in Solano County within this judicial district.

11. Pursuant to Civil L.R. 3-2(c) and 3-2(d) this action arising in Solano County is appropriately assigned to the Sacramento Division.

## THE PARTIES

12. Plastic Pollution Coalition is a project of Earth Island Institute, a not-for-profit organization. Plastic Pollution Coalition is a global alliance of individuals, organizations, and businesses working towards a world free of plastic pollution and its toxic impacts. With its work, Plastic Pollution seeks to put plastic pollution at the forefront of global social, environmental, and political discourse. Plastic Pollution Coalition is headquartered in California, as is it's sponsor, Earth Island Institute, and much of Plastic Pollution Coalition's work and membership is located in California. Plastic Pollution Coalition's members work, recreate, and live on or near the San Francisco Bay ("Bay") downstream of the Facility and the Facility's discharge. Several have professional interests in the Bay, including the studying and filming of wildlife. Members of Plastic Pollution Coalition have been, and will continue to be, directly and substantially injured in their use and enjoyment of their property and/or in their recreational and aesthetic enjoyment of the San Francisco Bay as a direct result of Amcor's violations of the CWA. The relief sought in this case would provide redress for these injuries. Additionally, because these injuries are being caused by pollution of waters of the United States and failure to adequately monitor and report discharges of pollutants from the Facility, the injuries fall within the zone of interests protected by the CWA.

13.     Plastic Pollution Coalition has standing to bring this lawsuit.

14.     Earth Island Institute is a not-for-profit, public interest, membership organization that supports people who are creating solutions to protect our shared planet. Earth Island Institute's headquarters are located in Berkeley, California, which is adjacent to the San Francisco Bay. Earth Island Institute acts as an incubator for start-up environmental projects, giving crucial assistance to groups and individuals with new ideas for promoting ecological sustainability, including the Plastic Pollution Coalition. Members of Plastic Pollution Coalition are also members of Earth Island Institute, and so their injury resulting from Amcor's violations of the CWA is identical to those alleged above in paragraph 12.

15.     Earth Island Institute, in its own right and through its project, Plastic Pollution Coalition, has standing to bring this lawsuit.

16.     Amcor is a California corporation operating in the State of California and the County of Solano.

## STATUTORY AND REGULATORY FRAMEWORK

17.     The objective of the CWA is to restore and maintain the "chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). In accordance with that objective, Section 301(a) of the CWA makes the discharge of any pollutant by any person unlawful, unless in compliance with a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

18.     The State of California has been delegated the authority to implement the permitting programs of the CWA by EPA, including the National Pollution Discharge Elimination System ("NPDES") permit program, pursuant to 33 U.S.C. § 1342(b). The State Water Resources Control Board ("SWRCB") is the water pollution control agency for purposes of the CWA, and has drafted regulations pursuant to that authority implementing the CWA's permitting programs within the State of California.

19.     To implement the CWA's permitting program for discharges of storm water associated with industrial activities, including containment of pre-production plastic, the SWRCB has adopted the Storm Water Permit. In California, any person who discharges storm

water associated with industrial activity must comply with all terms of the Storm Water Permit, unless they have an individual NPDES permit covering their storm water discharges. Discharges other than storm water are not permitted by the Storm Water Permit, and are in violation of the CWA unless authorized by another NPDES permit.

20. The Storm Water Permit generally requires facility operators to do three things: (1) eliminate unauthorized non-storm water discharges, (2) develop and implement a a Storm Water Pollution Prevention Plan ("SWPPP"), and (3) perform monitoring of storm water discharges and authorized non-storm water discharges—a Monitoring and Reporting Program ("MRP").

21. Noncompliance with <u>any</u> of the requirements of the Storm Water Permit constitutes a violation of the CWA and California's Porter-Cologne Water Quality Control Act. Water Code § 13160 (Water Board authorized to exercise any powers delegated to the State of California by the CWA).

22. A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violations of the terms and conditions of the Storm Water Permit. 33 U.S.C. § 1365(f).

23. **Eliminate Pollution Discharges.** The Storm Water Permit requires that facility operators reduce or prevent pollutants associated with industrial activity through the implementation of the best available technology economically achievable ("BAT") for toxic and non-conventional pollutants and the best conventional pollutant control technology ("BCT") for conventional pollutants.[2] A facility operator can comply with this requirement by developing and implementing a Storm Water Pollution Prevention Plan ("SWPPP") that (1) complies with the requirements in Section A of the Storm Water Permit (development and revision of a SWPPP) and (2) includes best management practices ("BMPs") that achieve BAT/BCT.

---

[2] Conventional pollutants are those typical of municipal sewage, and for which municipal secondary treatment plants are typically designed as biological oxygen demand (BOD), total suspended solids (TSS), fecal coliform bacteria, oil and grease, and pH. 40 C.F.R. § 401.16. Toxic pollutants are listed by chemical in the U.S. EPA's regulations. See 40 C.F.R. § 401.15. Nonconventional pollutants are all pollutants that are not included in the list of conventional or toxic pollutants in 40 C.F.R. Part 401. Nonconventional pollutants include pollutants such as chemical oxygen demand (COD), total organic carbon (TOC), nitrogen, and phosphorus.

24. The EPA has established benchmarks for pollutant discharges ("EPA Benchmarks"), which serve as the parameters to determine if a facility is properly implementing safeguards and procedures to prevent unlawful discharges. The EPA Benchmarks are relevant and objective standards to evaluate whether a facility has implemented the requisite BAT and BCT. Relevant to the present action, they include 100 milligrams per liter (mg/L) for total suspended solids ("TSS"). An exceedance of the 100 mg/L benchmark indicates a need to review and revise storm water management.

25. The Storm Water Permit prohibits the discharge of water that causes or contributes to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or applicable Regional Water Board's Basin Plan--here the San Francisco Bay Water Quality Control Plan ("Basin Plan").

26. **Storm Water Pollution Prevention Plan.** The Storm Water Permit requires that permittees develop and implement a SWPPP that meets certain requirements. The SWPPP has two major objectives: (1) to identify and evaluate sources of pollutants and (2) to identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. Among other things, a SWPPP must contain a compliance activity schedule, a description of industrial activities and pollutant sources, a description of BMPs, drawings, maps (including a site map), and relevant copies or references of parts of other plans. The SWPPP is a living document; A permittee must evaluate and update the SWPPP with additional BMPs necessary to achieve compliance with the Storm Water Permit, as, for example, when exceedance of an EPA benchmark indicates failure of BMPs to achieve BAT or BCT.

27. **Monitoring and Reporting.** The Storm Water Permit requires a permittee to develop a Monitoring and Reporting Program ("MRP"). The purpose of the MRP is to ensure compliance with the terms of the Storm Water Permit, monitor changing conditions, aid in implementation and revision of the SWPPP, and to measure the effectiveness of BMPs in use at the Facility. Diligent implementation of a rigorous MRP is critical to CWA compliance and enforcement. Both agency enforcers and citizens rely heavily on accurate monitoring and

reporting to stay apprised of pollution conditions, to monitor implementation of the CWA, and for enforcement where violations are shown.

28. Specific requirements of the MRP include: (1) monthly visual observations of storm water at each facility storm water discharge point throughout the Wet Season;[3] (2) collection of water samples at each facility storm water discharge point during the first and one other storm event each Wet Season; (3) analysis of samples for specific contaminants, including TSS; and (4) filing of Annual Reports with the Regional Board summarizing the visual observations, results of sampling analysis, and Storm Water Permit compliance. Observations must be made and samples must be taken during the first hour of storm water discharge following three working days without storm water discharge. Monitoring, including observation and collection of samples, is required "from all drainage areas that represent the quality and quantity of the facility's storm water discharges from the storm event."

## GENERAL FACTUAL ALLEGATIONS

29. Amcor manufactures plastic polyethylene terephthalate ("PET") bottles for the food and beverage industries at the Facility.

30. The Facility operates 24-hours per day, seven days a week, 52 weeks of the year.

31. The Facility receives pelletized PET via railcar and truck.

32. Storm water-exposed operations at the Facility include loading docks, transformers, compressed gas storage, water treatment, and storage of PET in eight silos of 220,000-pounds capacity each.

33. Amcor engages in industrial activities at the Facility that require it to report under, and comply with, the Storm Water Permit.

34. Amcor has identified four distinct drainage areas at the Facility. However, in the past five years and continuing until the present, Amcor improperly has observed storm water from only one storm drain location at the Facility ("DP-1"). DP-1 collects storm water from only one of four of the Facility's identified drainage areas. Omitted from observation are loading and unloading docks and some of the PET silos.

---

[3] The Wet Season is October 1 through May 30.

35. In the past five years and continuing until the present, Amcor has taken samples of storm water from only DP-1, improperly omitting the Facility's other three drainage areas.

36. Commencing in 2011 and continuing until the present, Amcor repeatedly has failed to conduct monthly visual observations of storm water discharges from the Facility and from all drainage areas of the Facility.

37. In at least one instance (January 2011), Amcor reported storm water observation in a month when there was no rainfall.

38. Commencing in in 2009-2010 and continuing until the present, Amcor has repeatedly failed to sample the first and one other rain event of each Wet Season, and to sample such rain events at each storm water outfall for the Facility.

39. Amcor's very limited sampling and reporting has nevertheless revealed discharge of total suspended solids in the Facility's storm water in significantly greater concentration than EPA's benchmark.

40. Amcor is likely to continue to discharge total suspended solids into waters of the State of California and United States via public storm sewers, both from the drainage area monitored at DP-1 and from the other unobserved and unsampled drainage areas at the Facility.

41. Suisun Slough is the receiving water to which the storm water from the Facility drains through public storm sewers. Suisun Slough flows into San Francisco Bay. Portions of Suisun Slough are tidal waters.

42. Suisun Slough is a continuously flowing stream forming geographic features depicted on official topographical maps.

43. The discharge of pollutants into Suisun Slough can significantly affect the chemical, physical, and biological integrity of Suisun Slough, a navigable in fact water, as well as navigable in fact waters downstream--namely the San Francisco Bay.

44. Suisun Slough and San Francisco Bay are "waters of the United States," as that term is used in the CWA and as that term has been interpreted by the federal courts.

45. The Facility is located adjacent to significant wetlands important to aquatic and avian life. Preproduction plastic of the sort exposed to storm water at the Facility is a serious

threat to wildlife that may mistake it for food and ingest it, often leading to starvation or exposure to other pollutants.

## PLAINTIFF'S CLAIMS

46. Each of the claims asserted by Plastic Pollution Coalition below was included in the October Notice.

### FIRST CAUSE OF ACTION
### Failure to Perform Storm Water Sampling and Analysis
### (Violations of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342)

47. Paragraphs 1 - 46 of this Complaint are hereby realleged and incorporated by reference herein.

48. The Storm Water Permit requires dischargers of storm water associated with industrial activity to develop and implement a MRP, which must include monthly Wet Season visual observation of storm water discharge and twice per Wet Season sampling of storm water discharge from each storm water discharge location of the Facility.

49. Amcor has failed to perform monthly Wet Season observe storm water discharges from all drainage areas within the Facility, commencing in the 2011-2012 Wet Season and continuing until the present.

50. Amcor has failed to sample all storm water discharge locations during the first and one other storm event, commencing in the 2009-2010 Wet Season and continuing until the present.

51. Each day since October 1, 2009, that Amcor has failed to develop and implement an adequate MRP for the Facility consistent with the requirements of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### SECOND CAUSE OF ACTION
### Failure to Develop an Adequate Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342)

52. Paragraphs 1 - 51 of this Complaint are hereby realleged and incorporated by reference herein.

53. The Storm Water Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

54. The Storm Water Permit requires that a permittee monitor storm water and revise the SWPPP to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water discharges.

55. Amcor's 2012-2013 Annual Report included discharge of TSS that significantly exceeded EPA's benchmark for that pollutant.

56. Amcor has not described the cause of this noncompliance nor described steps that were or shall be taken to reduce and prevent recurrence of the noncompliance.

57. Amcor has failed to revise its SWPPP to address high TSS in storm water from the Facility.

58. Each day since October 22, 2012, that Amcor has failed to develop and implement an adequate SWPPP for the Facility, and to revise the SWPPP to address on-going pollution in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## THIRD CAUSE OF ACTION
### Discharges of Materials Other Than Storm Water in Violation of Permit Conditions and the CWA
### (Violations of 33 U.S.C. §§ 1311(a), 1342)

59. Paragraphs 1 - 58 of this Complaint are hereby realleged and incorporated by reference herein.

60. Section 301 of the Clean Water Act makes unlawful "the discharge of any pollutant by any person," unless in compliance with a permit issued under the NPDES. 33 U.S.C. §§ 1311(a), 1342.

61. Storm water from the Facility is regulated pursuant to the Storm Water Permit which prohibits discharges of materials other than storm water directly or indirectly to waters of the United States. The Storm Water Permit also prohibits the discharge of toxic and deleterious substances and rubbish, refuse, and other solid waste to any place where they would eventually be transported to surface waters.

62. Amcor has discharged materials other than storm water on a regular and continuing basis to the storm drains of the City of Fairfield that discharge to Suisun Slough and ultimately to the San Francisco Bay with each storm event.

63. Every day Amcor discharged and continues to discharge materials other than storm water from the Facility in violation of the Storm Water Permit is a separate and distinct violation of Sections 301(a) and section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### False Certification of Compliance in Annual Report
### (Violations of Permit Conditions and the CWA, 33 U.S.C. §§ 1311, 1342)

64. Paragraphs 1 - 63 of this Complaint are hereby realleged and incorporated by reference herein.

65. Amcor has falsely certified compliance with the Storm Water Permit in each of the Annual Reports submitted to the Regional Board since July 1, 2010. Amcor has shown a steady pattern in the last three years of failing to perform storm water observations during wet months or misreporting its monitoring activity. Amcor has failed to observe or has misreported observations from three of the four drainage areas of the Facility. Amcor failed to sample any storm events in the wet seasons of 2009-2010, 2011-2012 and 2013-2014 despite months with significant rainfall in each of those reporting years. Amcor sampled only one time in wet season 2010-2011, despite multiple months of significant rainfall in that reporting year. Amcor reported visual observation of storm water discharge in the absence of rainfall.

66. Each day since at least July 1, 2010, that Amcor has falsely certified compliance with the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a). Amcor continues to be in violation of the Storm Water Permit's verification requirement each day that it maintains its false certification of its compliance with the Storm Water Permit.

**RELIEF REQUESTED**

WHEREFORE, Plastic Pollution Coalition respectfully request that the Court grant the following relief:

a. Enter a declaratory judgment that Defendant Amcor has violated and is in violation of the CWA, 33 U.S.C. §§ 1311(a) and 1342;

b. Order Defendant Amcor to comply with all terms and conditions of coverage of the Storm Water Permit;

c. Order Defendant Amcor to pay civil penalties of up to thirty-seven thousand five hundred dollars ($37,500) per day for each day of each violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. § 1319(d) and 1365(a);

d. Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

e. Grant such other and further relief as the Court deems just and appropriate.

Dated: March 18, 2015                    RACHEL S. DOUGHTY, ESQ.


By:  /S/ Rachel S. Doughty
Rachel S. Doughty, Esq.
Greenfire Law
JAMES BIRKELUND, ESQ
GARY DAVIS, ESQ (admission pending)